Here is the next case on the calendar, United States v. Cabral. Phil Weinstein, I'm an assistant federal defender, and I'm representing Mr. Cabral in this matter. Eleven years elapsed from the time Mr. Cabral was indicted in 2007 and the time he was arrested in October 2018. At least six years of that delay is attributable solely to the government's gross negligence. And as the Court knows, under the Barker factors, the reason for the delay is often critical. So let me go directly there, and I can backtrack to some of the other issues in the case. The government claim of reasonable diligence is based solely for this six-year period on entering its hit, Mr. Cabral's name, in its database. And while that might be sufficient in some cases, it wasn't in this because the government was on notice that there was a problem and did nothing about it. When did it have that notice? At least in 2012, when the State Department issued a visa, so they knew he had entered the country. In 2013, they discovered that he had flown from Germany to San Francisco. There's a letter in the file, in the appendix, that shows that. After having found that, and they accept that he entered seven times between 2012 and 2018 without triggering notice, on each of those occasions, he used his real name, the State Department had issued a visa, he had a valid passport from Brazil, which is— Wait a second. You're saying that they knew in 2012 that he had traveled under his own name into the United States? Is that what you just said? They weren't— I said the State—I'm sorry. Maybe I misspoke. The State Department had issued him a visa. There's no evidence. There was no evidence that the law enforcement agency, the Postal Inspection Service, that they knew at the time that he had traveled under his own name. They were unaware of that. They were assuming that they would get a notification of that, right? They didn't. They did not know in 2013. They learned—I mean, it's a little vague because you have no witness with firsthand knowledge who either prepared a declaration in this case or testified. Instead, they had a supervisory agent from the Customs Service who was basing his entire opinion on the records. Right. But, again, even whatever the evidence was, I don't think there's any evidence in 2013 that they realized there was a problem, that the Postal Inspection Service realized there was a problem with NCIC. I read the hearing to establish that they had no idea that there was a problem until— So isn't it an A192 of the appendix? Isn't your argument strengthened if you focus on 2014? Well, 2014 for sure, but in 2013, if you look at A192 in the joint appendix, or my appendix, there is a notation from—it doesn't identify the government entity, but it's dated 9-18-13, and it shows that he was on a Lufthansa flight to San Francisco on 10-3-2012. So this is part of the government's record. But that doesn't show an awareness by the Postal Inspection Service. Did it show that they had that document in their file and they knew? This is what was produced in discovery, so it wasn't produced— It just shows these are government records of what his travel was. It doesn't—I don't think that established knowledge. Well, if you were talking about, let's say, the Farm Bureau, that would be true. But I assume—I think it's fair to assume responsibility that the State Department, ICE, and the Customs Services work in conjunction. And— Correct me if I'm wrong. I thought the hearing established that they confirmed multiple times from 2008, 2009, 2010, 2013, 2014, even in January 2015, that the NCI system was—that it remained active and valid, right? So they were under the impression, even as of January 2015, that it was still going to be captured. Here is my disagreement. When they contacted ICE in 2014, ICE said—and they asked, when was the last time the defendant entered the country? Right. They said 2002. That was demonstrably false because he had been charged in this case in 2006. They also had—they also checked—finally, it was 2018 that they went back and found and attempted to determine why his name wasn't popping up. They had—as late as the time of the hearing, they had no explanation for it. And as soon as—they managed to fix it in some manner, but as soon as they did, the So it wasn't they didn't enter it, but it certainly wasn't alerting them to the fact that he was coming through, going through customs with a visa, a valid passport from Brazil, not under a false name, not disguising it. And by the way, that's something else I think is relevant. When is the first date that they learned, the Postal Inspection Service learned there was a problem with NCIC? I believe 2013. But they did nothing about it until 2000. I think it was no—late 2018. They don't give exact dates because it's on that. But the fact—I think that the relevance of the continued entry into the United States on seven occasions between 2012 and 2018, putting aside for the moment when NCIS—when inspection learned about it, it suggests that the defendant was unaware he had been charged. He did nothing to hide his identity. He got visas. He was coming back and forth. He was in the travel business. So it would— Their suggestion is, well, the district court found that his flight caused the delay and that as of 2012 he believed the statute of limitations had run and that he purposely, notwithstanding he was in the travel business, stayed out of the country until 2012. Well, I don't know that he has the sophistication to know about the statute of limitations. And in Rivera-Ventura, written by Judge Kearse, there has to be at least an element of the statute of limitations tolling his knowledge that he was fleeing in order of that. And there are two other reasons I would say. Even if you haven't been formally charged, if you flee in order to avoid the charges, that that's culpable, right? No, because I think there are other reasons. So, again, we don't know the substance of the conversation because the government produced— In Strayson, we said there is no requirement that the accused must leave after charges have been filed in order to be considered a fugitive, right? Yes. No, he's a fugitive that he can be charged. The question is, did they make diligent efforts to bring him to justice? Not that—I'm not arguing that he can't be charged. One of the factors is whether his flight caused the delay. And what I'm suggesting to you, if someone leaves the day before they're charged or a few days before they're charged, the fact that they're not charged doesn't mean they're not culpable for causing the delay. They're culpable. The question is whether he's contributing to the delay. So I purposely was focused on 2012 to 2018. But let me go back because in 2007, the agents called a phone number that they believed belonged to Cabral and left a message. They said they had some money for him, presumably to lure him back. He called back, or a person identifying himself as Cabral called back I think three months later. And during that conversation, again, we don't know the substance of it because the participants never testified or put in a declaration. But we do know, it's alleged, that he was never told he was wanted. So he's speaking to agents in 2007, never alerted to the fact that he's been indicted. If there is no extradition treaty from Brazil, which I understand there isn't, then there was no reason not to tell him. It wasn't like he was going to hide further. They're hoping he would come back. Well, they're hoping he's going to come back. They don't want to tell him. They believe he fled because he thought he was going to be charged. They know now he's out of the country. They don't want to tell him that you've been charged because then he'll never come back and they can't extradite him. Well, they wouldn't. Why would they presume that he was going to come back? They had no reason to believe he was because they were totally ignorant at that time, as the Court brought out, that he didn't pop in the data system when he did come back eventually. So he had no reason to know that. He also said, you know, in his original statement, there were checks that were written from Spain that were, I think, bank checks. I don't remember the exact term. But he said he didn't understand it was illegal. Now, that may not have been a strong defense, but it was something that he said when he voluntarily spoke to the officers. They didn't tell him to stay in the country. They didn't tell him he was about to be charged. They did take his passport. But there was never any notice that he had been was aware of that. Thank you, Your Honor. May it please the Court. Jacob Fiddleman for the United States. I'm an assistant United States attorney in the Southern District of New York. I represented the government in the district court and on this appeal. The district court did not abuse its discretion in denying the defendant's motion to dismiss. And there was no clear error in its subsidiary factual findings. First, that the delay was principally caused by the defendant's knowing flight from justice to a country from which he could not be extradited. Second, that the government acted with reasonable diligence at first in taking a number of steps in investigating the defendant's whereabouts, and thereafter, upon confirming that he had fled to Brazil and could not be extradited, relying on the NCIC database, coupled with periodic continued investigative steps to confirm that that database entry was active and that the defendant had not otherwise appeared in the country. Let me ask you a few questions, if I could, along those lines. Certainly. First, let me say that it's — I'm surprised that there aren't exact dates that are supplied. There are a range of dates. It's sort of vague, 2013, 2014. But putting that aside, let's say that we were — say you're right that Cabral caused at least the initial delay by returning to Brazil, and that let's also stipulate, for the sake of argument, that the government exhibited reasonable diligence by checking on the NCIC entry. So in 2012 — and correct me if I'm wrong as I proceed. Yes, Your Honor. Cabral has granted a visa and returns to the United States. That's correct. The USPIS learns about this in or about 2013 to 2014. Well, I'm not — I'm quoting. I'm quoting from the record in Appendix 161. So my question is, so at that point, why isn't USPIS on notice that the NCIC database isn't working as it should? Well, Your Honor, the — the record indicates that the Postal Inspection Service received an indication that he may have received a visa. And what they did was they exercised reasonable diligence by following up with Immigration and Customs Enforcement. Essentially, they checked, is this true? And what they were told, and there's no explanation as to why, but it appears to be an error by a separate and unrelated law enforcement agency, was no. The last time he entered was in 2002, which is not inconsistent. That's — ICE — ICE says that in — in March of 2014. That's correct. And — and then the periodic checks that the Postal Service — But didn't — but didn't USPIS know that that was incorrect? Because they — they had interviewed him in 2006. Well, I submit there's nothing inconsistent with entering the country in 2002 and still being present in 2006. They were not informed that he had left the country after 2002 and therefore knew that he had returned some — at some later date. So — so, okay, so let's say we're up — we're up to March of 2014. And am I not correct that for over four years, USPIS essentially takes no further action? After the — the actions taken in March 2014? Yeah. Well, in January 2015, they again confirmed that the entry in the NCIC database flagging the defendant as a wanted individual was still valid and active. And after that — Which they already knew. They knew the database was not working properly, right? Well, Your Honor, I submit they did not know that. Because when they received an indication that he may have entered the country during this period and followed up with Immigration and Customs Enforcement, they were told, no, he had not entered the country because the last time he entered the country was 2002, which essentially reasonably put them back in a position where they could continue to fairly rely on the NCIC database entry because they were continuing to be told that there was a valid entry in that database. And the one time they received an indication it perhaps wasn't working, they checked with ICE and were told, nope, he didn't reenter the country. So they were — it was entirely reasonable to rely on the database. And I think it's important, Your Honors, to remember the context that the Postal Inspection Service is in by 2014 and 2015. It has been almost a decade, eight to nine years. They took a number of significant steps when the defendant first fled and, in fact, spoke to the defendant and confirmed that he had absented himself. I don't question that at all. What I'm really focusing on is the period from — in the period from 2014 on. Yes, Your Honor. But the — I mean, it seems like this matter could have been resolved simply. You've got the Fugitive Locator Unit in late 2018. Yes, Your Honor. So the legal standard is clear that, in hindsight, the Court is not to assess other actions that the government could have taken, because there are always an infinite number of actions that a government agency could take in pursuing a fugitive with greater intensity. The assessment is whether, in light of all the facts and circumstances in the history of the case, whether what the government did was reasonably diligent. And here, in 2014 and 2015, the government was acting against a backdrop of having confirmed the defendant had fled to Brazil knowingly and willfully and having periodically taken additional steps to investigate whether he had ever returned to the United States and having been consistently reassured that he had not. There was a — there's a point in the — in the history where they receive a potential indication that he had flown into San Francisco. They followed up on that lead. They called the hotel that he supposedly had stayed at and was told that nobody by that name had stayed at the hotel. So by this time, there are several years of indicia that the defendant remained in Brazil and that the NCIC database was functioning properly and had a valid and active entry, and the government submits that there's nothing unreasonable after that record has been created for eight or nine years to rely on the NCIC database. And there are numerous courts. This Court has held repeatedly that reliance on the NCIC database, coupled with reasonable investigative efforts, is sufficient when the defendant is a knowing fugitive. And a number of other circuits have so held, and the government cites those cases in its brief. Robertson In addition to the NCIC lodging it in there, they did run periodic database searches over the years. I believe I read that in the record as well, right? So it wasn't just that they just relied on the database and did nothing else. That's correct. They — they periodically searched various databases, driver's license databases, other personal record databases that would indicate, pulling from a variety of different sources, whether this individual was in the United States taking out loans, registering vehicles, and things of that nature. So — so admittedly, those steps and checks may have become less frequent over time, but there's nothing unreasonable about that in the circumstances. I just want to go back to this, to page 161 of the record, because I'm looking at that now. It says that they received an indication that he had received a visa from the State Department in 2012. But, I mean, you could — that doesn't necessarily mean that someone came to the United States, you could receive a visa, and then ultimately not travel, right? I agree, Your Honor. So, okay. So, in other words, it wasn't like irrefutable proof that he had been in the United States. It was not something that says he was in San Francisco, then they would know there's something wrong, unless he traveled under a false name. But this is just an indication that he may have — if it's true, that he may have intended to travel, and then they checked it. That's — that's correct, Your Honor. And I submit that that — that's further indication why it was reasonable diligence for the postal inspectors to check with ICE rather than the State Department, because ICE is the agency that would tell them whether he had in fact entered the country. So I'd like to take a minute and address the question of prejudice, because Judge Hellerstein correctly found as a factual matter that there was no prejudice to the defendant here. And — and there was no clear error in that factual determination. This was a principally document-based case. The documents, as the district court said, say what they say. And in the absence of any concrete and particularized demonstration of how the passage of time adversely impacted the defendant's ability to defend the case, the district court correctly balanced all of the factors in determining that there had been no violation of the defendant's right to a speedy trial. So unless the Court has any further questions, I'll rest on the written submission. Thank you. Thank you, Your Honor. So let me respond to the government on several fronts. First, the government had used the word indication. I don't know what indication means, but either he got visas or he didn't get visas. I assume the State Department keeps records of that. And once they discovered that he had received a visa, whether he entered or didn't enter, it certainly would have been — it's not just hindsight to say to the State Department, let us know if he ever applies again. Well, he applied seven other times, and they had no indication of that. As for relying on ICE, ICE failed, because he did enter the United States on a number of occasions. Whether he entered in 2012 or 2013 or 14, 15, ICE did not notice it. As to whether he entered that time, well, visa — the government posits a possibility 2002 he didn't leave until 2006. Well, then he would have been an overstay because he'd entered on a visa. And there's no indication that there's an overstay in this case. Anywhere from there in — There's no case that says if ICE fails, then they're responsible for that. The law enforcement agency that's trying to check and relying on the system is then not responsible for ICE's failure, right? Well, they are, if they are — They called ICE. If they didn't call ICE, that would be a problem. But they called ICE, and ICE told them, no, he hasn't been here since 2002. Right. And that — Why should that be a dismissal of the indictment? I think that was demonstrably false because, among other things, they — one, they knew he was here in 2006. Now, he may have overstayed. We don't know that. But that certainly — visas have — I think it's 60 days, if I recall correctly. But I may be wrong on that. But there is a finite time you can stay with a visa. ICE — and then he got other visas. He got repeatedly — he — presumably he got four or five other visas. They also knew that — whether he entered or not — that they had information that he had flown from Germany to the U.S. in 2012. They had a Lufthansa flight number. So maybe he didn't get on that. I don't know. But it's a case with a burden. The burden is on the government, not the defendant. And they — all they produced were records that are inconclusive at best and support the defendant's position — I think are more supportive of the defendant's position. And courts, including the Supreme Court, have held that their — the presumption of prejudice is available in the — in the Supreme Court case docket. It was eight years of delay, six of which were the responsibility of the government. And there were other cases where, cited in the brief, where there were three years. So you can presume prejudice. And the defendant also had said there was another person here in his original statement who assured him it was fine, didn't know where he was. So there were arguments to be made. Thank you. Thank you both for your arguments. The Court will reserve decision.